[File No. 6543.]

FREDERIC T. CUTHBERT, Appellant, v. BERT SMUTZ, as Sheriff of Ramsey County, North Dakota, Respondent.

(282 N. W. 494.)

Opinion filed November 21, 1938.   Dissenting opinion filed November 30, 1938.
Rehearing denied December 9, 1938.

*Sinness & Duffy* and *Traynor & Traynor,* for appellant.

*Alvin C. Strutz,* Attorney General, and *T. A. Thompson* and *B. F. Tillotson,* Assistant Attorneys General, for respondent.

580

BURR, J. The legislative assembly, by chapter 271 of the Session Laws of 1935, amended previous laws dealing with income taxes, prescribed the rates of taxation, and added what is known as "the emergency clause" in § 7,. as follows: "This act is hereby declared to be *an emergency measure,* and shall be in full force and effect from and after its passage and approval."

Section 5 of the act provides that: "This act shall be effective on all income received during the year ending December 31, 1935, as provided in this act."

The complaint alleges, among other things, that pursuant to the directions of the state tax commissioner, the defendant, as sheriff of Ramsey County, "did on the 28th day of October, 1937, . . . levy

upon certain personal property . . . of the plaintiff for the purpose of . . . enforcing the payment of . . . income taxes claimed . . . to be due to the State . . . from the plaintiff." The complaint also alleges that in order to prevent sale of the property seized, the plaintiff, under compulsion and written protest, paid the amount of the taxes claimed; that the measure involved was referred to the people on June 24, 1936 and decisively rejected.

The defendant demurred to the complaint on the ground that it did not state facts sufficient to constitute a cause of action. The trial court sustained the demurrer and from the order sustaining the demurrer the plaintiff appeals.

The act involved was approved by the governor March 12, 1935; by its terms it was to be "effective on all income received during the year ending December 31, 1935 . . . ;" it contained the usual emergency clause and theoretically went into effect on the day of approval; a referendum petition was filed within "ninety days after the adjournment of the session of the legislature at which such measure was enacted" in accordance with the provisions of § 25 of the Constitution; at the election held June 1936 the measure was repealed; the tax commissioner thereafter determined the amount of tax due on all defendant's "income received during the year ending December 31, 1935;" and the levy was made October 28, 1937.

Appellant urges two general propositions. First, he asserts the legislative declaration of an emergency is not conclusive upon the courts; that as made by the legislature it was wholly without foundation, was false in fact, was attached to the measure for the sole "purpose of preventing the free exercise of the referendum against the same and with a view of preventing its suspension by such referendum and with a view of frustrating the referendum provisions of the Constitution of North Dakota, and that in so far as such emergency section is concerned the said Act (emergency clause?) was unconstitutional and void under the provisions of § 25 of the Constitution of North Dakota, which section among other things provides: " 'Laws may be enacted to facilitate its (the referendum's) operation, but no law shall be enacted to hamper, restrict, or impair the exercise of the rights herein reserved to the people.' " Second, he claims that the repeal of

this measure by the vote of the people nullified all liabilities and penalties imposed by the act.

The original emergency provision (Const. § 67) provided: "No act of the legislative assembly shall take effect until July first, after the close of the session, *unless in case of emergency* (which shall be expressed in the preamble or body of the act) the legislative assembly shall, by a vote of two-thirds of all the members present in each house, otherwise direct." The constitutional provision in effect when this chapter 271 was approved is an amendment thereof and provides: "No act of the legislative assembly shall take effect until July 1st after the close of the session, unless the legislature by a vote of two-thirds of the members present and voting, in each house shall *declare it an emergency measure,* which declaration shall be set forth in the act; provided, however, that no act granting a franchise or special privilege, or act creating any vested right or interest other than in the state, shall be declared an emergency measure. An emergency measure shall take effect and be in force from and after its passage and approval by the governor." (Const. § 67.) This amendment makes important changes. The original provision permitted no change of date "unless in case of emergency," leaving possible basis for dispute as to ultimate authority in determining "emergency," whereas the amendment permits two-thirds of each house to "declare it an emergency measure. Also, the change prevents the legislature from declaring as an emergency measure any "act granting a franchise or special privilge etc." and thus limits legislative action. Again, instead of expressing the emergency itself in the preamble or body of the act, the legislature is merely required to declare the law *an emergency measure* and set forth the *declaration* in the act.

In neither provision is the term "emergency" defined, nor is the legislature required to give reasons, state the basis for its judgment, or to vote separately on the emergency declaration as many state constitutions require. If "two-thirds of the members present and voting, in each house" approve an act containing in the body of the act a declaration that it is an emergency measure, then it becomes one. The journal of each house shows such vote.

The limitation—"granting a franchise or special privilege etc."—is not involved here. This being so, the legislature is not prevented from

declaring the law to be an emergency measure. The legislature, being supreme in legislative matters, may legislate on any subject and in any way it sees fit unless prevented by some provision of the state or Federal Constitution. See State v. First State Bank, 52 N. D. 231, 202 N. W. 391.

Appellant asks this court, in effect, to pass upon the reasons for declaring it an emergency measure in order to determine whether an "emergency" exists. This quotation from State ex rel. Satterthwaite v. Hinkle, 152 Wash. 221, 277 P. 837, is applicable here: "We are asked to say that the solemn statement of the legislature is false, and to say so not because we are possessed of any knowledge upon the subject, but because we are ignorant upon it. We can take no testimony; we have no machinery with which to gather the facts, which the legislature is presumed to be possessed of, but, totally in the dark, we are asked to substitute our personal prejudices, predilections and preconceptions for the presumably enlightened judgment of those deputed by the Constitution of the state to inquire into and determine these factual problems. It is only when the court, following the Brislawn Case, can say from its judicial knowledge, that a patent contradiction exists upon the face of a legislative enactment, that, in law or in reason, it can deny the legislative declaration of emergency."

In this Brislawn Case, 84 Wash. 302, 147 P. 11, 12, the court makes this general distinction:

"Where there is a declaration in the Constitution that no law shall take effect unless in a case of emergency to be declared by the Legislature, it may be truthfully said that the general rule is that a court will not review the declaration of the legislature, but where the people have put upon the Legislature a limitation in the way of a specific definition of its power and an elimination of acts of a certain character, the rule is that the declaration of an emergency must conform to the constitutional requirement.

" 'In those jurisdictions in which, under the general rule, statutes do not take effect until some time subsequent to their passage and approval, it is commonly provided that, when an emergency exists, the Legislature may declare a statute in force from its passage. Under such provisions, the Legislature is the sole judge as to whether an emergency exists, and its declaration is not open to question by the

courts. Where, however, such special provisions, permitting the Legislature to except certain statutes from the general rule, are found in the Constitution, the legislative declaration that an emergency exists must conform to the constitutional requirements, and must be clear, distinct, and unequivocal.' 36 Cyc. pp. 1193, 1194; Cooley, Const. Lim. 7th ed. 76."

Because of divergent decisions of differing jurisdictions cited by appellant, it is necessary to note the basic constitutional provisions interpreted.

Long before the principle of the referendum became incorporated in state constitutions, there was frequently a limitation on legislative power to accelerate the effective date of a law. For substantial reasons, apparent to any thinking mind, it was necessary that a reasonable time should elapse between the approval of legislation and the time the new law would go into effect; but it was also apparent the exigencies of the situation might require a law to go into effect immediately and, naturally, the legislature was entrusted with the power to determine this necessity. However, to guard the general liberties of the people, the legislature, ordinarily, would not be permitted to vary the constitutional time fixed except in cases of emergency, and most frequently the power to accelerate the effective date of an act was confined to cases of appropriation measures and measures required for the preservation of the peace, health and safety of the commonwealth.

When the constitution declares a law shall not go into effect until a certain date specified in the constitution, or until a certain length of time after the adjournment of the legislature, such as ninety days, it places a limitation on legislative power, but the provision for variation permits the legislature to remove the limitation in a special case by following certain methods. In general, such special case is termed an emergency measure and if the legislature so considered it, then by the constitutions of many of the jurisdictions cited by appellant it is required to so state in the bill itself, set forth in the act the reasons for declaring it an emergency measure and, frequently, this determination must be shown by the journal of each house to have been adopted and declared by two-thirds of the membership of each house. It is clear therefore that under such provisions, before a so-called emergency measure would be an emergency measure in fact, the conditions

for removing the constitutional limitation must be shown. It becomes a matter of interpretation of law. Hence it is that in many of the jurisdictions cited the courts hold that it is their duty to examine the face of the bill and the journals of the house to determine whether the measure is in fact such a one as comes within the classifications necessary to remove the constitutional limitation from legislative action and the proper method has been followed; though some hold that even in such a case the legislative statement of fact is conclusive.

In Hanson v. Hodges, 109 Ark. 479, 160 S. W. 392; Re Menefee, 22 Okla. 365, 97 P. 1014, 1018; Kadderly v. Portland, 44 Or. 118, 74 P. 710, 721, the courts hold that the legislative declaration is conclusive upon the courts even in cases where the constitution limits the power of the legislature to declare an emergency to cases necessary for the immediate preservation of the public peace, health or safety.

With the adoption of the principle of referendum a new situation arose. The people reserved to themselves the power of passing upon any measure enacted by the legislature. The public became a part of the legislative department of the state.

An examination of the various constitutional provisions relative to the referendum principle shows constitutional limitations on the power of the public in this respect. At times the people limited this referendum power so that appropriation bills or bills which affected the peace, health and safety of the state could not be referred, or that such emergency measures could be referred only by securing an increased number of petitioners, or that even though referred by an increased number of petitioners, nevertheless the law was in full force and effect until repealed by an adverse vote.

Therefore, in construing the effect of referendum petitions these courts were required to examine the acts involved to ascertain if they were such as could be referred, and what was necessary in order to secure a referendum.

The history of the referendum in our own state illustrates this. The original constitutional provision dealing with this new method of legislation provided: "The second power is the referendum . . . and it may be ordered (*except as to laws necessary for the immediate preservation of the public peace, health or safety*), as to any measure or any parts . . . passed by the legislative assembly. . . ." In order

to determine whether the law sought to be referred was one "necessary for the immediate preservation of the public peace, health or safety" the Constitution provided: "When it is necessary for the immediate preservation of the public peace, health or safety that a law shall become effective without delay, such necessity and the facts creating the same shall be stated in one section of the bill, and if upon aye and no vote in each house two-thirds of all the members elected to each house shall vote on a separate roll call in favor of the said law going into instant operation for the immediate preservation of the public peace, health or safety, such law shall become operative upon approval by the governor." These, or similar provisions, are quite common and under them these courts held they were required to determine whether the bill was in fact necessary for the immediate preservation of the public peace, health or safety, and whether the legislature desired it to become effective without delay, which could only be done by the legislature in an approved method. The law might be necessary for the immediate preservation of the public peace and yet be susceptible of being referred as the legislature may not have given a two-thirds approval. This distinction must be noted because of the apparent conflict of authorities.

Our people, however, changed this constitutional provision. § 67 of the Constitution as amended is still in force. The legislature declares an emergency exists. Such emergency measure may be referred, but it is a law until the people reject it by an adverse vote. A limited number of petitioners may secure a referendum, but this does not suspend the operation of an emergency measure. Thirty thousand electors may require an immediate election, or the governor may call an immediate election, but an emergency measure is still a law. Not until there is an adverse vote does an emergency measure cease to be an existing law.

It is important to note this distinction for a non-emergency measure does not go into effect until July 1 and as the petition referring any measure must be filed before that time in order to obtain a vote, the result is it never becomes effective as a law if rejected by the people at the election. An emergency measure, however, *is* a law even though a referendum petition be duly filed, and remains a law until the people repeal it at the election.

The original referendum provision in the Constitution affected § 67 of the Constitution in this way. Up to the time of the adoption of the initiative and referendum in 1914 there was no limitation on the power of the legislature by "a two-thirds vote of all the members present in each house" to express an emergency in the preamble or body of the act. If it did, the bill became an emergency measure. The original referendum amendment was then adopted and made applicable to all legislative measures—emergency and non-emergency—except such as were in the bills themselves declared to be necessary for, the "immediate preservation of the public peace, health or safety," and when this declaration was adopted by a two-thirds vote as a separate poll.

In 1918 the present referendum amendment was adopted, eliminated all reference to the "immediate preservation of the public peace, health or safety," and qualified the effect of the referendum proceedings on measures containing a declaration of. emergency by providing that *all* such measures were in fact laws until repealed by the people at the election.

Section 67 of the Constitution remained and in 1918 was amended, permitting the legislature to declare the bill an emergency measure, but prohibiting the legislature from declaring an emergency where the act granted "a franchise or special privilege" or created "any vested right or interest other than in the state." ·

Appellant cites numerous cases in support of the contention that this court has the right to pass upon the validity of a declaration that a measure is in fact an emergency measure, such as McClure v. Nye, 22 Cal. App. 248, 133 P. 1145; Amos v. Conkling, 99 Fla. 206, 126 So. 283; Graham v. Dye, 308 Ill. 283, 139 N. E. 390; McIntyre v. Com. 221 Ky. 16, 297 S. W. 931; Payne v. Graham, 118 Me. 251, 107 A. 709, 7 A.L.R. 516; Merrill v. Lowell, 236 Mass. 463, 128 N. E. 862; People v. Stambosva, 210 Mich. 436, 178 N. W. 226; Atty. Gen. ex rel. Barbour v. Lindsay, 178 Mich. 524, 145 N. W. 98; State ex rel. Pollock v. Becker, 289 Mo. 660, 233 S. W. 641; State ex rel. Westhues v. Sullivan, 283 Mo. 546, 224 S. W. 327; State ex rel. Goodman v. Stewart, 57 Mont. 144, 187 P. 641; State Bd. of Milk Control v. Newark Milk Co. 118 N. J. Eq. 504, 179 A. 116; Todd v. Tierney, 38 N. M. 15, 27 P. (2d) 991; Culhane v. Equitable Life Assur. Soc. 65 S. D.

337, 274 N. W. 315; State ex rel. Satterthwaite v. Hinkle, 152 Wash. 221, 277 P. 837.

An examination of these and similar cases shows situations entirely different from the one involved here. Missouri and Michigan have constitutional provisions which permit the legislature to accelerate a law when it is a general appropriation act or necessary for "the immediate preservation of the public peace, health or safety of the state," and this declaration must be embodied in the act. In such cases it is held (289 Mo. 660, 233 S. W. 641; 178 Mich. 524, 145 N. W. 98) that the court would examine the act to see whether it was an act necessary for the preservation of the public peace, health or safety as this imposed a definite limitation on legislative action—the constitutions of these states requiring the emergency to be expressed in the act. It is interesting to note the dissent in the Missouri case, and also that the Michigan court (178 Mich. 532, 145 N. W. 101) makes an apparently approving comment on the Oregon and South Dakota decisions because of the provisions for emergency legislation in the respective constitutions, which require a mere declaration in the act that an emergency exists.

The Maine case and the Kentucky case are similar; the Constitution requiring "that the facts constituting the emergency shall be expressed in the preamble," or "that the reasons for the emergency . . . must be set out at length in the journal of each house," and this not having been done, the courts held there was no emergency in fact. Yet in the Kentucky case the three dissenting judges take the position that the courts are bound by the declaration of the legislature.

The California decision of the court of appeals is based upon the fact that the Constitution states: "Whenever it is deemed necessary . . . that a law shall go into immediate effect, *a statement of the facts constituting such necessity* shall be set forth in one section of the act . . ." and the decision says: "No attempt was made to comply with the constitutional requirement as to emergency measures, hereinbefore set forth." 22 Cal. App. 255.

The court therefore considered the bill, said by the legislature to be for "the usual current expenses of the state," and held it was not, stating, "Nor is this a case where we are bound by the legislative declaration. . . ."

If the facts showing a bill should go into immediate effect were not set forth, there was no emergency measure and therefore a referendum could not be prevented if one were sought. Because such right existed the court said the declaration in the bill was ineffective.

In the Illinois case the court held the declaration of emergency invalid, not on the ground that the courts had the right to pass upon the emergency itself, but because the Illinois Constitution required the emergency to be expressed in the preamble or body of the act and the legislature had merely stated that an emergency existed. The court held that the statement "an emergency exists" was not equivalent to expressing the emergency itself; but does show "the Legislature is the judge of what facts and conditions create an emergency." 308 Ill. 289, 139 N. E. 390, 392.

The Massachusetts case was determined by the holding that the vote of the municipal council involved, declaring its action one "of urgent necessity for the immediate preservation of the public peace, health and safety" was not such a vote as was required by the law for that purpose as it was passed without being proposed in writing, and without notice being given to the public as required by law. The court expressly states it does not determine whether a mere statement of urgent necessity, without mentioning the particular facts constituting the emergency, is sufficient to satisfy the requirement that the ordinane shall contain "a statement of its urgency."

The New Jersey case involved the exercise of the police power of the state to take charge of matters affecting public health. It in no way affected the cause of the acceleration of the time of the taking effect of an act.

In 283 Mo. 546, 224 S. W. 327, the New Mexico case, and the Montana case, the courts were considering the question of referendum in connection with the declaration of emergency and were construing referendum provisions which prevented measures dealing with and affecting "the public peace, health and safety" from being referred. The courts held they would examine the measures sought to be referred to determine whether they belonged to the class which was excluded from referendum proceedings. In an earlier New Mexico case the Supreme Court of that state held (Hutchens v. Jackson, 37 N. M. 325, 23 P. (2d) 355, 361) that the courts had no power to go behind and overturn

the legislative declaration of an emergency made in constitutional form, for the purpose of denying immediate effect to an act. However, the question whether an act could be referred was a different matter, the court saying in the New Mexico case cited (38 N. M. 15, 27 P. (2d) 991) that in such case the "Legislative declaration that law was emergency law, though rendering law immediately effective, and conclusively preventing referendum petition *from suspending law,* is not conclusive on court in determining whether law is actually safety measure exempt from referendum and repeal by the people."

In the Florida case cited, 99 Fla. 206, 126 So. 283, the legislature stated, "Whereas an emergency exists, etc." The opinion does not set forth the constitutional provision required, but Article 3, § 18 of the Constitution of Florida provided: "No law shall take effect until sixty days from the final adjournment of the session of the Legislature at which it may have been enacted, *unless otherwise specially provided in such law."* Under such constitutional provision, citing Neisel v. Moran, 80 Fla. 98, 108, 85 So. 346, the court held the legislature had the right to state when a statute should take effect. It is difficult to see therefore why in 99 Fla. 206 the court would proceed to determine whether an emergency existed merely because the legislature so stated, when, if the legislature had omitted that term and merely provided for the taking effect of the law, it would have been effective from the date chosen.

The South Dakota case, Culhane v. Equitable Life Assur. Soc. 65 S. D. 337, 274 N. W. 315, does not help the appellant. The court passes upon the constitutional limitations upon referendum procedure showing that the referendum is not applicable to laws which "are declared by the act itself to be necessary for the immediate preservation of the public peace, health, or safety of the state, etc.," and while such law may be subject to the referendum, it is only in a case where the legislature has not declared it necessary for the immediate preservation of the public peace, etc. However, "If the Legislature declares such a law necessary for the immediate preservation of the public peace, health, or safety, and attaches to such law an emergency clause as provided for in § 22, art. 3 of the Constitution, then such law will go into effect immediately or at such time thereafter as the Legislature may fix, and in the meantime it will not be subject to the referendum." Nowhere in that decision does the court claim the power to go behind legislative declaration; in fact,

the court says, "By declaring the emergency the Legislature has declared the immediate necessity for the law."

Appellant cites Fitzpatrick v. State Bd. of Examiners, 105 Mont. 234, 70 P. (2d) 285, 287, wherein the court says, with reference to "the State Insurance Act," that this act "was in full force and effect during the interim allowing the people to act between its operative date as declared in the act itself, and the date of the declaration of the result of the election." Nevertheless, "An act of the Legislature, when it is referred, voted upon by the people, and by them disapproved, becomes thereby ineffective from the beginning, not because the people repealed it, but because it lacks the approval of a constitutional branch of the legislative department. The entire process of the referendum is legislative in character." The appellant argues therefore that the effect of the referendum on our law in question was to render it nugatory from the beginning.

We note an important difference between the constitutional provision of Montana with reference to the referendum and our constitutional provision referring to a similar matter. The Montana Constitution, Article 5, § 1, provides: "Any measure referred to the people shall still be in full force and effect unless such petition (the referendum petition) be signed by fifteen per cent. of the legal voters of a majority of the whole number of counties of the state, in which case the law shall be inoperative until such time as it shall be passed upon at an election, and the result has been determined and declared as provided by law. . . ." The petition in question apparently was not signed by the requisite percentage.

Our constitutional provision (§ 25 of the Constitution) provides, with reference to an emergency measure, that such law when referred *"shall be a law until voted upon by the electors.* And if it is then rejected by a majority of the votes cast thereon, *it shall be thereby repealed."* This change of language makes a distinction between the two constitutions and renders the decision of the Montana court of little value to us. We may agree that there is little vital distinction between the Montana term "shall still be in full force and effect" and the North Dakota term "shall be a law until voted upon by the electors," though the North Dakota term appears to be stronger in character. However, it is clear our people, by the constitutional provision, intended the

measure to be a law in the full sense of the word, and to have the same force and effect as any act of the legislative assembly until such act be repealed by a subsequent legislative assembly. The effect of the Montana decision would be that the vote of the people vetoed the act, and until vetoed it was in effect, but the veto was retroactive. It is difficult to see how a measure could be "in full force and effect" interim and then become "ineffective from the beginning."

Our Constitution says that by means of an adverse vote the law of the legislative assembly "shall be thereby repealed." The act of the legislative assembly and the act of the people by the referendum, in their legislative capacity, are two separate and distinct things. Neither is dependent on the other.

A valid emergency measure is a law of the state until repealed by a subsequent legislature or until repealed by the people through the means of the referendum.

Appellant strenuously contends that the legislative declaration of an emergency, where no emergency in effect exists, is violative of that provision in § 25 of the Constitution, which says, with reference to the operation of the initiative and referendum, "Laws may be enacted to facilitate its operation, but no law shall be enacted to hamper, restrict or impair the exercise of the rights herein reserved to the people." It is argued therefore that a false declaration is in effect an act hampering and restricting the exercise of the referendum.

The constitutional provision invoked is not applicable here, even if the courts could review the legislative declaration. The constitutional provision quoted is dealing with laws affecting the method of carrying out the initiative and the referendum. The constitutional provision contains many provisions which are more or less legislative in their nature, evidently with the purpose of outlining methods, and then permits the legislature to add further legislation provided the legislation facilitates the operation of the initiative and referendum.

The provision quoted from § 25 of the Constitution deals with procedural matters affecting these reserved powers. It has no reference to the legislative power to declare an emergency. This bill involved does not deal with the initiative and referendum. It is not a bill which in its nature hampers, restricts, or impairs the exercise of these powers. The constitutional provision providing for the referendum recognizes and

gives full force and effect to the legislative power to declare a measure an emergency measure, declares the effect of a referendum petition upon such measure, and thus harmonizes the constitutional provisions.

It is for the legislature of this state to determine whether an emergency exists. But such determination does not permit the statute to go into effect earlier than "July 1st after the close of the session" unless the declaration that it is an emergency measure is stated in the act. The legislature determines there is an emergency; it then, by the requisite vote, states so in the act. In such case it becomes an emergency measure and the decision of the legislature that it is an emergency measure is not subject to review by the courts of this state.

It is conceivable that a case might arise where the legislature would state that an act which by its very terms granted a franchise or special privilege was an emergency measure, and this would involve the limitation on the power of the legislative assembly. We do not consider the duty of the court in such case. It is not involved here.

The second proposition deals with the effect of the election. The election was held June 24, 1936. Therefore, this emergency measure was a law of the state until June 24, 1936, at least. By the terms of the statute the act was "effective on all income received during the year ending December 31, 1935." (§ 5 of the Act.) The law therefore was a valid legislative act during the time this income was earned.

Appellant urges that the repeal of the law canceled all right to collect this income tax. There is no question but what the adverse vote repealed the law; but this repeal is no different in its nature then the repeal of a legislative act by a subsequent legislature. The repeal by the vote of the people is exactly the same kind of a repeal as if it were enacted by a subsequent legislature—no more and no less. Section 7316 of the Code provides: "The repeal of any statute by the legislative assembly shall not have the effect to release or extinguish any penalty, forfeiture or liability incurred under such statute, unless the repealing act shall so expressly provide and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture or liability."

It is true § 7316 is dealing with "the repeal of any statute by the legislative assembly" and does not in its express terms provide for the repeal of any statute "by the people themselves through the exercise of

the referendum;" but the principle announced in State v. Houge, 67 N. D. 251, 255, 271 N. W. 677, 679, and the reasoning therein is applicable here. Thus § 7316 applies to the repeal in question. See also Hertz v. Woodman, 218 U. S. 205, 54 L. ed. 1001, 30 S. Ct. 621; Higgins v. Hubbs, 31 Ariz. 252, 252 P. 515.

But one point remains to be determined. Appellant contends that in any event the tax sought to be collected had never become a liability while the law was in force and that the attempt of the tax commissioner to collect the tax is rendered useless by the repeal.

Section 7316 keeps in force any "liability incurred under such statute." "The taxable status of persons and property generally relate to a day certain in each year, and, when the law so provides, no taxes can be legally assessed . . . unless the conditions requisite to liability exist on the day fixed." Com. ex rel. Moore v. P. Lorillard Co. 136 Va. 258, 118 S. E. 323.

Chapter 271 is an amendment of chapter 253 of the Session Laws of 1933, which is an amendment of article 35 of the Political Code set forth in the Supplement, §§ 2346a1 to 2346a50. Throughout these statutes the term "income received during the year" is used, and by § 3646a1 of the Supplement, subd. 14, "the term 'received,' for the purpose of computation of net income under this act, means 'received or accrued' and the term 'received or accrued' shall be construed according to the method of accounting upon the basis of which the net income is computed under this act." This definition is carried forward throughout the act and is applicable to the law under consideration. The distinction between actual receipt and accrual must be kept in mind for the date, December 31, 1935, is the date which fixes the period of liability for the income tax year. Holmes on "Federal Taxes," 6th ed. pages 495 and 1250, shows the distinction. All through these statutes it is clear the liability is determined by the status on the date fixed. Section 2346a23 of the Supplement required the taxpayer to make his returns, compute the amount of tax due under his return, and attach thereto his "check, draft or money order, payable to the state treasurer, . . . for the amount of tax as so computed. . . ." He had the option of making payments in quarterly installments, the first installment "paid at the time fixed by law for filing the return . . . ," and this return had to be "made on or before the fifteenth day of the third

month following the close of the fiscal year, or if the return is made on the basis of the calendar year, then the return shall be made on or before the fifteenth day of March." The amendment nowhere altered these provisions. Under subd. 5 of the Act in question the calendar year is the year fixed for the cut-off date for the income received, and therefore it was the duty of the taxpayer to file his return and pay the tax "on or before the fifteenth day of March," 1936.

There is a liability for the tax though a lien may not have attached. An unpaid income tax is and continues a mere personal liability of the taxpayer until its payment is demanded, and thereafter a lien attaches. This distinction is well set forth in Black on "Income and other Federal Taxes" 4th ed., page 537, in discriminating between the liability for a tax and the attachment of a lien.

The liability here was incurred then even though the amount may not have been officially demanded by the commissioner and such liability is not extinguished by the repeal. The order sustaining the demurrer is affirmed.

CHRISTIANSON, Ch. J., and BURR, NUESSLE and MORRIS, JJ., concur.

Mr. Justice SATHRE, being disqualified, did not participate, Hon. W. J. KNEESHAW, Judge of Second Judicial District, sitting in his stead.

KNEESHAW, Dist. J., dissenting. I dissent more particularly to that portion of the majority opinion which holds that § 7316, Compiled Laws of 1913, (commonly known as Saving Clause) is applicable to the Referendum—§ 7316 by its express terms only applies to laws passed by the Legislative Assembly and in no way refers to Initiated or Referendum matters, and as a matter of fact § 7316 was passed long prior to the passage of the Initiative or Referendum and therefore it could not have been contemplated that § 7316 could or would apply to Initiative or Referendum.

It is unfortunate that this case came up on demurrer rather than on the merits and we have therefore got to assume that each and every

fact alleged in the complaint and properly pleaded are admitted to be true.

This Court in the case of State v. Houge, 67 N. D. 251, 271 N. W. 677, has already held that an Initiated Law came within the Saving Clause of the Statute in § 7316. And in my opinion the Court stretched its imagination pretty far. Assuming that the holding in the Houge case was good law and it must be treated as such, I cannot see how, under any reasoning, that rule can or should be applied to a Referendum voted upon by the people—the two cases are entirely different. In the case of an initiated law, the people make a law the same as one passed by Legislative Assembly and in such law can make provision for specifically repealing any section of the statute that they desire to repeal, including penalties, but that cannot be done in a referendum matter. The only question involved in a Referendum is as to whether the Law shall be sustained and all the voters or people can do in the matter is to vote "yes" or "no," and our law provides that when the vote is taken and the law defeated the effect of the vote is to repeal the whole Act, and, in my opinion, the authorities cited hold that after the defeat of the law by referendum vote that the law becomes void from its inception.